Filed 10/28/25  In re L.C. CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| In re L.C. et al., Persons Coming Under the Juvenile Court Law. | |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY,<br><br>        Plaintiff and Respondent,<br><br>        v.<br><br>N.S. et al.,<br><br>        Defendants and Appellants. | D085502<br><br><br>(Super. Ct. Nos.<br>J520838A, J520838C, J520838E) |

APPEAL from orders of the Superior Court of San Diego County, Alexander M. Calero, Judge.  Affirmed.

Pamela Rae Tripp, under the appointment by the Court of Appeal, for Defendant and Appellant N.S.

Jack A. Love, under the appointment by the Court of Appeal, for Defendant and Appellant J.C.

Brent Riggs, under the appointment by the Court of Appeal, for Defendant and Appellant J.

David J. Smith, County Counsel, Lisa M. Maldonado, Chief Deputy County Counsel and Evangelina Woo, Deputy County Counsel, for Plaintiff and Respondent.

This appeal involves minors J., age 10; Y., age 6; and L., age 4. These children and two of their nondependent siblings came to the attention of the juvenile court as a result of reports of domestic violence between N.S. (Mother) and J.C. (Father[1]). Following failed attempts at family maintenance and reunification, the juvenile court scheduled a hearing under Welfare and Institutions Code[2] section 366.26 to select permanent plans for the children. In response, both Mother and Father filed section 388 petitions asking for the children to be returned to their care, and the court set these petitions for a contested hearing to be held in conjunction with the contested permanency plan hearing.

After the presentation of both documentary and testimonial evidence, the juvenile court made a series of rulings that are at issue here. The court (1) denied both parents' section 388 petitions; (2) found the two younger children, Y. and L., adoptable and determined no exceptions to adoption applied; (3) ordered the termination of parental rights as to those two children; and (4) ordered a permanent plan of legal guardianship for the eldest child, J., maintaining jurisdiction as to him and scheduling a review hearing.

---

[1] The children who are the subject of this appeal do not all share the same father. Minor J., who is also an appellant in this matter, and Y., who has not appealed, are the children of M.M. M.M. briefly appeared in the underlying proceedings and was appointed counsel, but his counsel was relieved in November 2023 as a result of lack of contact from her client. M.M. has not appeared in this appellate matter. J.C. is L.'s father and is a party to this appeal. Although J.C. is pursuing his parental rights with respect to L., only, for simplicity and ease of discussion, we refer to J.C. as Father in this opinion.

[2] Undesignated statutory references are to the Welfare and Institutions Code.

2

Mother, Father, and J. have appealed the court's order on the section 388 petitions, as well as the order on the permanency plan for Y. and L. under section 366.26. Mother and J. assert the court erred in denying Mother's section 388 petition, while Father contends the court erred in denying his section 388 petition. Mother and J. also challenge the court's decision to terminate Mother's parental rights to Y. and L., arguing that the court should have applied the beneficial relationship and sibling relationship exceptions to adoption. Father contends the trial court should have applied the beneficial relationship exception to adoption with respect to L.

Finding no legal error or abuse of discretion by the juvenile court in any of its orders, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. *Detention, Jurisdiction and Disposition*

Mother has five children who came to the attention of the Agency—the three children who are the subject of this appeal, as well as X.G. and X.S. The San Diego Health and Human Services Agency (the Agency) filed a petition on behalf of all five children after receiving a referral regarding domestic violence between Mother and Father. The referral was made after an August 15, 2021 incident in which Mother and Father each alleged the other was physically violent, and Father was arrested. The Agency's petitions alleged the children were at substantial risk of serious physical harm due to ongoing domestic violence between Mother and Father.

The social worker who was assigned to investigate the Agency referral learned that police had responded to the family's home 14 times in the period between January 2020 and August 2021. Six of the police calls involved domestic violence. Additionally, his review of the parents' history with the Agency revealed multiple referrals had been made because of domestic

3

violence, some as early as June 2017. At that point in time, Mother was involved in domestic violence with J. and Y.'s father, M.M. One incident involved inflicted damage to a vehicle while J. was inside it. After a February 2018 incident, the Agency offered Mother a voluntary services case, which she completed successfully.

A number of the prior incidents involved violence between Mother and Father, and Mother informed the social worker that she and Father had separated after at least one of them. But they then resumed their relationship after criminal charges were dropped, and Mother initially denied that any further physical violence had occurred between them after that. Later, however, she admitted to the social worker there had been other domestic violence incidents, including one in which Father "stomp[ed]" on her head." She also acknowledged J. had witnessed the violence.

On August 27, 2021, the juvenile court ordered the children detained with Mother on the condition that Father remain outside of the home. The following month, the parents requested a trial regarding the truth of the allegations in the petitions. A jurisdiction and disposition report filed in September 2021 recommended that Mother be provided family maintenance services and that Father be granted unsupervised visits with L.

After the court's August 27, 2021 order, the social worker observed Mother with bruising on her left eye, as well as swelling around her mouth and the left side of her face. Mother said she had been accosted by a neighbor while at an event with her children. Father acknowledged to a social worker that he and Mother had agreed to tell a previous social worker that nothing had happened between them, and he then recounted at least one specific incident of violence during which, according to Father, Mother was the aggressor. In late October 2021, Mother complained that Father had been

4

following her and at one point blocked her car with his, prompting her to call the police.

At the jurisdiction and disposition hearing, the court sustained the petitions as to all three children, J., Y., and L., and ordered family maintenance services. One condition imposed by court was that both parents would maintain custody of L. as long as they resided separately.

## B.    *Family Maintenance Review*

In preparation for a family maintenance review hearing, a social worker reported that Mother and the children were living with the maternal grandmother as Mother searched for housing. At this point in time, Mother was not in compliance with her court-ordered parenting class, having completed only 7 of the required 21 sessions, but she had been participating in individual counseling.

Of concern was the fact that J. had been missing a significant amount of school. He was reported absent or late 62 percent of time. Mother offered no reasonable explanation for this, instead complaining the line for school drop off was always long, despite the fact the family was living a block away from J.'s school.

Father had made some progress in his case plan. He completed his required parenting classes and indicated he found the classes beneficial. Father also reported that he and Mother were no longer romantically involved, and had been successfully coparenting L. However, Father made no progress in connection with the requirement he participate in and complete a domestic violence group.

Because Mother and Father appeared to be progressing in their parenting plans but concerns remained, the social worker recommended they be provided six more months of services.

5

## C.     *The Section 387 Petitions*

In early May 2022, a week after the initial review hearing, the Agency filed petitions under section 387 seeking removal of the children from the parents' care.  The new petitions asserted that on January 25, 2022, Mother and Father had engaged in a physical altercation near Father's home.  It was further alleged that Mother and the children had been residing with Father without the awareness or permission of the Agency or the court.

A subsequent detention report provided the details of the altercation. Father shoved Mother, and police observed a bruise under her eye.  In the report it was noted that a newly assigned social worker had asked Mother about bruising around her eye in January 2022.  At that time, Mother told this social worker that a client had punched her in the face when she was cleaning the client's home without wearing a mask.  The maternal grandmother confirmed Mother's claim.  Mother also insisted that she had been living with the maternal grandmother, which the maternal grandmother also confirmed. The report noted the Agency's concern that the grandmother had assisted Mother in covering up the domestic violence, reflecting a familial failure to protect the children.

According to the detention report, neighbors also confirmed that Mother and Father were living together with the five children in Father's apartment complex.  These witnesses described the parents as fighting "all the time."

At the detention hearing, the court detained the children out of Mother's care but allowed them to live with the maternal grandmother on the condition Mother did not reside there.  The court "strongly admonished" the maternal grandmother "to be very open with the court as to what is going on in the home" in order for the children to "stay in her home."

6

In an addendum report, the reporting social worker described Mother as having prepared what appeared to be an official legal document, with a judge's name on it, that stated "all the parties are in agreement for the children to reunify with the mother." The social worker was worried Mother would present this document to the children's school, babysitter, or maternal grandmother in order to reunify with the children without a true court order. The social worker also reported that Mother had disclosed another incident of domestic violence between her and Father. She claimed Father tried to intimidate her with his car, while Father claimed that Mother was the aggressor and stated he had filed for a restraining order against her.

At a contested review hearing held on July 12, 2022, both parents testified. The court ultimately sustained the section 387 petitions, removing J. and Y. from Mother's care and L. from Mother and Father's care. It placed all three children with the maternal grandmother and ordered unsupervised visitation for both parents.

## D.     *The Agency's Section 388 Petitions*

Approximately two months after the July contested review hearing, the Agency filed petitions under section 388, asking to modify the parents' visitation status to supervised, based on yet another domestic violence incident that occurred a month after the last court hearing. During this incident, Father placed his body on top of Mother's, held her down, slapped her, dragged her out of the apartment, and locked her out. She sustained bruises on both arms, her chin, and a swollen cheek. Mother indicated to police she did not want to press charges. According to the social worker, Mother told her therapist the bruises on her arms were caused by her job as a dishwasher. In addition, other family members who live in the same apartment complex as Father reported to the Agency that Mother was seen

7

there with Father after he was released from custody following his arrest for the recent domestic violence incident.

The Agency obtained two more pieces of information that were cause for concern. First, the reporting social worker discovered that the maternal grandmother had allowed Father to take L. overnight for L.'s birthday. Second, the Agency received a police report documenting yet another domestic violence incident between Mother and Father in late September. Grabbing Mother by her right arm and leg, Father tried to pull her out of his vehicle. Despite this, Mother informed the social worker that she did not need domestic violence shelter resources. In her view, she was "not in a domestic violence relationship" and planned to "continue to live with" Father.

At a hearing on the Agency's section 388 petition, the court ordered that visitation for both parents would be supervised.

## E.  *The Remainder of the Reunification Period*

### 1. *L.'s Removal from His Placement with the Maternal Grandmother*

On December 30, 2022, the Agency filed a second section 387 petition for L. In it, it was alleged that the maternal grandmother could no longer provide appropriate care for him. The grandmother had, for at least a second time, allowed L. to have an unsupervised visit with the parents and, while L. was in their care, they engaged in yet another physical altercation. This time, Father threw a metal frying pan at Mother's head and a ceramic plate at her hand. He also hit her with a belt and an electric cord several times. Mother also admitted there had been multiple domestic violence incidents that December, before the second section 387 petition was filed.

In response to the section 387 petition for L., the juvenile court detained him in a licensed foster home as of January 4, 2023, and ordered supervised visits for the parents.

8

2. *The Delayed Six-Month Review Hearing*

The Agency recommended termination of services for Mother and Father at a March 7, 2023 six-month review hearing. The hearing had been continued several times to allow for completion of an investigation and an opportunity for the Agency to facilitate reunification of X.S. and X.G. with their fathers.

The Agency reported significant concerns about the pattern of domestic violence between Mother and Father. The social worker noted that Mother continued to repeat the same behaviors with respect to Father, despite individual therapy and participation with a domestic violence group. The social worker explained that Mother's therapist had at one point shared her "suspicion the mother and the father were together the whole time." The therapist also indicated that while Mother had "made growth in being more transparent," at the outset she was lying "[Ninety-nine percent] of the time." As a result, the therapist continued to encourage Mother to be truthful.

The therapist was concerned about Mother's safety, and she observed a pattern in which domestic violence seemed to occur every two month or so. The parents have "not been able to manage 6 months without domestic violence," and yet Mother continued to report to the therapist that "she understands" the fact that the "true victims are her children." The therapist made the decision to terminate Mother from her care because Mother "is waiting for [Father], she does want to be with him, and she is just waiting for him to make the change so their relationship improves," and so "the reality is that she is not ready to make that leap to leave him."

The Agency also noted similar concerns with respect to Father. In particular, Father repeatedly failed to be forthcoming about the domestic violence between the couple. Despite his participation in and completion of services, he, too, demonstrated no true behavioral change.

In response to the Agency's recommendation that services be terminated, Mother and Father requested a contested hearing.

3. *The Removal of J. and Y. from the Maternal Grandmother's Care*

On April 10, 2024, just over four months after filing a section 387 petition for L., the Agency filed section 387 petitions for J. and Y., seeking their removal from the maternal grandmother's care. The petitions alleged the maternal grandparents had engaged in domestic violence. According to the maternal grandmother, she and the maternal grandfather began fighting after he consumed alcohol. He eventually pulled her down a flight of stairs. J. and Y. were removed from her care and detained in the same licensed foster home as L. the day after the March 24, 2023 incident.

The juvenile court detained J. and Y. out of the maternal grandmother's care and ordered a counseling referral for J. The parents were offered two supervised visits with the children per week. Father discontinued his visits after obtaining a new job, and the Agency reported Mother was routinely 15 minutes late to the visits.

4. *The Contested Six-Month Review Hearing on the Section 387 Petitions*

At a contested six-month review hearing on May 5, 2023, both parents testified. The juvenile court sustained the section 387 petitions for J. and Y., ordering that they be placed in the licensed foster home of L.'s caregiver. The court continued reunification services to the parents for another six month period.

5. *The 12-month Review Hearing Period*

A 12-month review hearing was set to take place on June 13, 2023. In a report prepared for this hearing, the Agency recommended services be terminated for the parents and a section 366.26 permanency hearing be set. The Agency's report noted that despite all of the services provided to Mother and Father, there had been eight reported incidents of domestic violence between May 2022 and June 2023. In March 2023, Mother was discharged from her virtual domestic violence group because she reported that she was still living with the perpetrator of the domestic violence and the facilitator could hear Father coaching Mother during the meetings. Similarly, Mother's individual therapist terminated Mother from her care for similar reasons and expressed to the social worker serious concern for Mother's well-being. The Agency report noted that Mother was pregnant again, and the pregnancy did not interrupt the pattern of domestic violence.

Father continued to deny the domestic violence allegations against him, and took no personal responsibility for the violent altercations between him and Mother.

Both parents requested a contested hearing to decide issues of continued reunification services, expanded visits, and/or the children's return. The Agency requested that any trial be set as a combined 12- and 18-month review hearing.

6. *The Contested 12- and 18-Month Review Hearing*

In the period leading up to a contested review hearing, J. was hospitalized due to threats of self-harm. At a pretrial status hearing in November 2023, counsel for the children told the court that J. was requesting expanded visits with Mother. But in her role as J.'s guardian ad litem, she

11

stated that her opinion on the matter was consistent with the Agency's recommendations.

The court held a contested combined 12- and 18-month review hearing over two days in late November and early December 2023.  Although Mother had finished her 52-week domestic violence class in October 2023, the social worker was of the opinion that she had not implemented the lessons from that class and had not demonstrated any behavioral changes.  The social worker noted that throughout the entire case, Mother lived with Father and the domestic violence pattern continued.  At times they would claim to have separated, but then they would be back together again.  At other times, they would say they had never separated.  The "same behaviors" kept repeating through the life of the case.

The social worker explained that Mother had again reported she was not in romantic relationship with father, and she said she was living with her mother.  But when the social worker made an unannounced visit to Father's home and spoke to neighbors, she was told Mother continued to be seen at Father's home on a daily basis.[3]  In addition, although no new police reports had been filed in the prior six months, a relative who lived downstairs from Father reported he continued to hear yelling and Mother crying.

The social worker raised the issue of J.'s threats of self-harm and his hospitalization.  She was concerned that if J. was returned to his Mother's care and her relationship with Father remained unstable and volatile, J. was at risk of following through on harming himself.

---

[3]     The record demonstrates that Mother and Father were sharing custody of the new baby together during this time.

Mother testified to having obtained new, flexible employment, as well as childcare. She explained that she and Father had a new child and they were coparenting together well. According to Mother, they alternated weeks with the child, and the exchanges occurred through Monday pick-ups from the infant's daycare. To explain her frequent visits to Father's home, Mother said she was picking up the baby's items from Father. According to Mother, she was not romantically involved with Father and wanted to reunify with the children on her own. Mother denied having previously violated the court's orders regarding visitation and claimed there had been no domestic violence incidents for approximately a year.

The court acknowledged the parents had appeared to make progress from where they were when the case had been opened. However, it concluded the Agency had met its burden to demonstrate that returning L. to Father would create a substantial risk of detriment to L.'s physical or emotional well-being. It made a similar finding with respect to Mother and all three children. The court noted the repeated pattern of serious domestic violence between the parents, the evidence suggesting they continued to see each other on what may have been a daily basis, and the fact that their arguing and fighting had not abated. It found Mother's testimony "less than credible" due to her tone, demeanor, and answers that appeared to conflict with other evidence in the record. The court rejected the possibility of placing the children with Mother or the maternal grandmother for purposes of additional family maintenance due to the unauthorized visitation that occurred during both parties' caregiving.

Ultimately, the court determined that termination of reunification services for Mother and Father was appropriate. In the court's view, the Agency had demonstrated by clear and convincing evidence that reasonable

13

services had been provided to the parents but returning the children to their care would continue to place their well-being at risk. The court set a selection and implementation proceeding to take place 120 days later and suggested the parents could, with the assistance of their attorneys, file a section 388 petition asking for a change in the court's orders.

**F.    *The Permanency Phase***

1. *The Time Period Leading Up to the Section 366.26 Hearing*

J. was moved to a different foster home on December 1, 2023. The caregiver who had been caring for all three children was unable to provide care for him as a result of his self-harm ideations and other behaviors. J.'s new caretakers were open to pursuing legal guardianship of J. They explained they did not want to sever J.'s ties with his mother, given her importance to him. Y. and L. remained together in their placement, and their caregiver indicated a desire to pursue adoption. During this time, Mother visited the children every Sunday, and was also present for sibling visits that occurred on Tuesdays.

In June 2024, the Agency received a referral for Mother and Father's youngest child. There was an allegation the parents had once again engaged in domestic violence, this time while the youngest child was present. Mother informed a social worker she would not allow Father to see the child. She temporarily moved to Anaheim in July 2024, citing concerns for the child's safety. She reported there had been altercation with Father and showed videos of police arriving at her home. Father shared with the social worker emails from Mother that he interpreted as threatening, and he shared videos of an altercation between the pair.

14

In preparation for the section 366.26 hearing, the Agency recommended that J.'s caretakers be appointed his legal guardians and jurisdiction be terminated.[4] With respect to Y. and L., however, the Agency recommended freeing them for adoption. The social worker summarized Mother's visitation with the children between April through August 2024, noting she was appropriate with the children and attentive to their needs, but struggled to set limits at times. She reported that the children were not upset when the visits concluded and separated from Mother easily.

With respect to Father's visitation with L., the social worker noted that Father did not consistently attend the scheduled visits, and this caused the Family Visitation Center to close Father's referral. She was able to observe two visits between Father and L., however, and both times L. left the visit without incident. L. did not appear upset when Father said goodbye and left. He did not ask for Father in between visits.

The social worker reported that Y. and L. continued to be adoptable, and their caretaker expressed a commitment to adopting them. Since the case had been opened, Y. was diagnosed with speech delay and mixed receptive-expressive language disorder; L. was diagnosed with autism. Their caretaker advocated for their needs, and both children made developmental progress and improved while in her care. The children expressed physical affection for the caretaker, giving her hugs and kisses. They called her "Mama Maria."

In the reporting social worker's view, the benefits of adoption to Y. and L. outweighed the potential detriment they might suffer as a result of terminating parental rights. This was based on the children's young age, and observations that the children were thriving in their placement, were not

---

[4] This hearing was continued multiple times over many months.

upset when visits with Mother ended, and did not ask for Mother in between visits. In addition, L. also did not appear upset at leaving visits with Father, and did not ask for him in between visits. The social worker also noted that the sibling relationship between the children and J. was not such that the two younger siblings were upset at the conclusion of the sibling visits, and because they were not living with J., their shared common experiences were limited to these visits.

In response to the Agency's recommendations, Mother requested a trial on the permanency plan and indicated a section 388 petition would be forthcoming. The court granted the parents' request that Y. and L. be made available for a bonding study.

Approximately a week after the initial permanency plan hearing, J. was appointed new counsel and a separate attorney was appointed to represent Y. and L. J.'s new attorney filed a section 388 petition seeking recognition of his relationship with Y. and L. under subdivision (b) of the provision and asking to present evidence regarding the permanent plan for his siblings. Mother filed a section 388 petition in which she requested unsupervised visits, reinstatement of reunification services, and the development of a "transition plan to reunify the minors with" her "after expansion of [her] visitation." J.'s new attorney argued in support of granting Mother's section 388 petition, and opposed the Agency's recommendation of legal guardianship for J. Counsel suggested that if a return to Mother was not going to be pursued, then the request would be for a "permanent plan of long-term foster care," given that "supportive services" would end under a legal guardianship.

The trial court made findings that Mother and J. had made a prima facie showing that a hearing on their section 388 petitions would be in the best interests of the children, and the court set the evidentiary hearing on October 30, 2024, the same date on which the section 366.26 permanency plan trial was set to proceed.

Visits between Mother and the children continued between the status hearing and the October 30 trial date. At one visit, J. expressed displeasure with not being permitted to return to living with Mother. For the most part, however, the children appeared to enjoy their visits with Mother but also appeared fine when the visits ended. Mother brought an unknown man to one of the visits. He paid for Mother and the children's admission to a pumpkin patch and later dropped off food, water, and sunblock. The social worker asked Mother who the man was, and Mother responded, "[A] very close friend of mine." The social worker advised Mother to attend the visits alone, as doing otherwise could confuse the children.

Although Father also continued visits with L., he cancelled two consecutive weekend visits, one of which was L.'s birthday visit.

2. *The Joint Contested Hearing on the Section 388 Petitions and the Section 366.26 Permanency Plan*

The contested hearing on Mother's section 388 petition and the children's permanent plans took place over six days between November 2024 and January 2025. During this time, Father also filed a section 388 petition in which he requested that L. be returned to his care.[5]

The court heard testimony from Mother, Father, ten-year-old J., a maternal uncle who lived with the maternal grandmother, a social worker, an

---

[5] Father was allowed to present evidence at trial in connection with his section 388 petition after the parties submitted on the issue of a prima facie finding.

17

expert in clinical psychology who had conducted a bonding study for Mother, and a licensed daycare provider.

The social worker testified that the benefits of adoption for Y. and L. outweighed the value of a continued relationship with Mother. She explained that Y. and L. both have special needs and were being provided services to address those needs. Y. was diagnosed with ADHD and anxiety, has an IEP in place for speech services, and receives in-home and school behavioral support. L. was diagnosed with autism and receives ABA therapy three times a week. He also has an IEP for speech services. The social worker noted that Mother was difficult to reach at times about the children's school-related services. She was also concerned as to whether Mother would be able to maintain all of the services if the children were returned to her care.

With respect to Father's request to care for L., the social worker highlighted that L. had been out of Father's custody for half of his life. And when L. was in the parents' care, he had been exposed to significant domestic violence. Father had engaged in consistent visitation with L. between October and December 2024, but the social worker still believed a return to Father's care was not in L.'s best interest. Father had not attended any of L.'s medical appointments and did not seem to understand L.'s autism diagnosis.

As to J., however, the Agency was recommending legal guardianship with supervised visits for Mother. The social worker commented that Mother had a history of being untruthful with the Agency, and most recently had not been honest about the nature of her relationship with her new boyfriend. In addition, the social worker was concerned that Mother was having inappropriate discussions with J. about the case and its possible outcomes. She indicated that J.'s caregivers were committed to the plan of

18

guardianship, and she had no concerns about their ability to provide the requisite support. The relationship between J. and his caretakers was positive, and his mental health issues appeared to be stable.

J. testified that he wanted to live with Mother, and he insisted that "[s]he [has] changed a lot." According to J., Mother was "really nice" now. J. talked about the history of violence in the home, and explained that the parents would hit each other. When asked what he would do if he were returned to Mother's care and there was physical fighting in the home or things were not safe, J. said he would "maybe" tell someone. He was concerned that the dependency process would start again if he told someone that violence was occurring in his home. He also expressed concern about what Mother would do if he told someone she was doing something she should not be doing.

The court designated Dr. Elizabeth Stanton as an expert in clinical psychology, and she testified about the bonding study she completed for Mother. Dr. Stanton has conducted over 100 bonding studies, and has been called to testify over 40 times. She explained that "bonding" is best described as the parent's desire to care for the child, whereas "attachment" better describes the connection of a child to the parent. In conducting her study for this case, Stanton observed two visits between Mother and the children. In her view, the children engaged in healthy attachment behaviors directed toward Mother, and she responded in a healthy way. Stanton had not read the Agency's reports before conducting her observations, believing her opinions should be based solely on direct observation of the interactions between the children and Mother. She conceded that children could be securely attached to multiple adults, and that it would be possible for a child

to have secure attachment disrupted or severed without the child suffering detriment. Stanton's written bonding study was entered in evidence.

Mother testified that she lived in a one-bedroom apartment and had beds for the children. She said that although her current job with Amazon required her to be outside of the home, she would soon be transferred to an at-home position. Mother reported that she continued to have visits with her two other children, X.S. and X.G., even though their fathers had custody of them. She acknowledged that she had a new romantic partner, whom she brought on visits with her other children sometimes. Although Mother had not shared this information before, she stated she would be willing to provide this individual's date of birth so the Agency could conduct a background check.

In Mother's view, she had been transparent with the Agency in all respects for the past two years. She completed more than one domestic violence course and had developed relapse prevention plans. Mother discussed L.'s autism diagnosis, and she was aware he was being provided services at home and at school for speech, communication, and behavior. She thought Y. did not have any diagnoses, but was aware she had hitting behaviors and tantrums. She was aware that J. was in therapy to address the effects of the domestic violence and his self-harm ideations.

Mother stated she was not allowing Father to have contact with their youngest child, who remained in Mother's care. She felt strongly that Father's visits with L. should be supervised, and if L. was returned to her care, she would wait to get an order from the family court regarding visitation before allowing Father to visit with L. If the court ordered unsupervised visitation, she would appeal and would not comply in the interim. When asked about her ability to coparent with Father, she said,

20

"I don't see why we should even co-parent at this point." When asked whether she would allow J. to have visits with Father, she indicated she would not because Father was not J.'s biological father and there was "no reason" for him to be in communication with J.

Father testified about his visitation with L. He explained that before October 2024, he was struggling mentally and emotionally, which hindered his ability to visit consistently. Father did not communicate with L.'s caretaker often because he knew L. was safe in her care and she was taking good care of him. Although Father was aware that L. had been diagnosed with autism, he did not know how that condition affected him. Father testified that the last domestic violence incident in which he was involved occurred in February 2024, when he and Mother argued and yelled at each other regarding their nondependent child. Father had not seen that child since that point in time, even though he had obtained a court order allowing him to visit with that child twice a week. One time when Mother would not allow him visitation, he called the police but was informed Mother was refusing visitation. A second time he called the court and was advised to initiate contempt proceedings. Father admitted he and Mother argued again in July 2024.

At the conclusion of the hearing on January 16, 2025, the court denied both parents' section 388 petitions.[6] It also terminated parental rights as to Y. and L., but ordered a plan of legal guardianship for J., with the court continuing to assert jurisdiction over him as a dependent. As to J., the court made a finding that he is adoptable, but determined the exception in section

---

[6] At an earlier hearing the court granted J.'s unopposed section 388, subdivision (b) petition, seeking to have his sibling relationship with Y. and L. recognized for purposes of permanency planning.

366.26, subdivision (c)(1)(B)(iv) applied.[7]  J.'s caretakers were appointed as his legal guardians.

## DISCUSSION

Mother and J. contend the juvenile court erred in denying Mother's section 388 petition, while Father similarly challenges the court's denial of his section 388 petition.  All three appellants also assert the court erred in finding that the beneficial relationship exception did not apply to avoid the termination of parental rights as to Y. and L.  Mother and J. additionally argue the court erred in finding that the sibling relationship exception did not apply.

**A.     *The Section 388 Petitions***

1. *The Relevant Legal Framework for Assessing Section 388 Petitions*

The section 388 modification procedure is an " 'escape mechanism' when parents complete a reformation in the short, final period after the termination of reunification services but before the actual termination of parental rights." (*In re Kimberly F.* (1997) 56 Cal.App.4th 519, 528 (*Kimberly F.*).)  Under section 388, a parent, interested person or the dependent child may petition the court to change, modify or set aside a previous order on the grounds of changed circumstances or new evidence.  (§ 388, subd. (a).) The petitioner has the burden to show a change of circumstances or new

---

[7]     This provision provides an exception to termination of parental rights where a child is determined to be adoptable but "[t]he child is living with a foster parent or Indian custodian who is unable or unwilling to adopt the child because of exceptional circumstances that do not include an unwillingness to accept legal or financial responsibility for the child, but who is willing and capable of providing the child with a stable and permanent environment, and the removal of the child from the physical custody of their foster parent or Indian custodian would be detrimental to the emotional well-being of the child."  (§ 366.26, subd. (c)(1)(B)(iv).)

evidence, and that the proposed modification is in the child's best interest. (*In re Jasmon O.* (1994) 8 Cal.4th 398, 415; Cal. Rules of Court, rule 5.570(e).) In connection with a section 388 petition, the parent must show a "genuine change of circumstances" and not merely changing circumstances. (*Kimberly F.*, at p. 529.)

"In considering whether the petitioner has made the requisite showing, the juvenile court may consider the entire factual and procedural history of the case. [Citation.] The court may consider factors such as the seriousness of the reason leading to the child's removal, the reason the problem was not resolved, the passage of time since the child's removal, the relative strength of the bonds with the child, the nature of the change of circumstance, and the reason the change was not made sooner. [Citation.] In assessing the best interests of the child, 'a primary consideration . . . is the goal of assuring stability and continuity.'" (*In re Mickel O.* (2011) 197 Cal.App.4th 586, 616; see *Kimberly F.*, *supra*, 56 Cal.App.4th at pp. 531–532.)

Importantly, "[a]fter the termination of reunification services, the parents' interest in the care, custody and companionship of the child are no longer paramount," and instead " 'the focus shifts to the needs of the child for permanency and stability.'" (*Stephanie M.* (1994) 7 Cal.4th 295, 317 (*Stephanie M.*).) "A court hearing a motion for change of placement at this stage of the proceedings must recognize this shift of focus in determining the ultimate question before it, that is, the best interests of the child." (*Stephanie M.*, at p. 317.)

We review the juvenile court's ultimate determination on a section 388 petition for an abuse of discretion (see *Stephanie M., supra*, 7 Cal.4th at pp. 318–319), and any factual findings supporting that determination for substantial evidence (see *In re Maya L.* (2014) 232 Cal.App.4th 81, 102

23

[under abuse of discretion standard findings of fact are reviewed for substantial evidence].)  Under the abuse of discretion standard, we do not substitute our judgment for that of the juvenile court.  Instead, we ask whether the court's ruling fell outside the bounds of reason.  (See *Stephanie M.*, at pp. 318–319.)  Therefore, "[i]t is rare that the denial of a section 388 motion merits reversal as an abuse of discretion."  (*Kimberly F., supra*, 56 Cal.App.4th at p. 522.)

2.  *The Court's Findings on the Parents' Section 388 Petitions*

The juvenile court found that Father failed to demonstrate the circumstances had changed between the court's termination of his services and the time of trial.  As the court noted, Father relied on his completion of his domestic violence program and the fact he was no longer in a relationship with Mother as the changed circumstances.  But the evidence demonstrated that the parents "continued to have a high-conflict dynamic," and they had engaged in a documented altercation as recently as July 2024.  The court also considered the seriousness of the reason for L.'s removal from Father's care, the relative strength of L.'s bond with Father, and the fact the asserted changed circumstances—Father and Mother no longer being in a romantic relationship and the length of time since the last documented domestic violence incident—did not mean the underlying domestic violence dynamics had been fully addressed or eliminated.  Rather, the court found it likely that the domestic violence would continue given the lengthy history of the case, the parents' inability to alter their behavior despite the children being removed from their care, and their on-going high-conflict dynamic.

24

The court noted that the bond between L. and Father was not particularly strong, given L. had been out of Father's care for nearly half of his life. In addition, Father's visits had largely been supervised, and they had been inconsistent until only the few months before trial. The court reasonably inferred that the inconsistency in Father's visits negatively impacted the relationship. And in considering whether a change to Father's care would be in L.'s best interests, the court was concerned that Father appeared to know very little about L.'s autism or the unique needs that come with such a diagnosis. The court concluded that a modification of its prior orders was unwarranted, and therefore denied Father's request to return L. to his care.

With respect to Mother, the court found she similarly failed to demonstrate sufficiently changed circumstances. Although she had completed her domestic violence program before her services were terminated, the court was concerned Mother had not really benefited from the program, as she continued to be in a relationship with continued domestic violence occurring while completing her course. And the court again pointed out that although the domestic violence between the parents had seemed to subside recently, the relationship was still contentious and involved a high-conflict dynamic. In fact, Mother's testimony reflected her "strong feelings regarding [Father]," making the court concerned that "negative interactions resulting from the conflict between her and [Father] will be part of the family's reality in light of the history of this case and the dynamic that continues to exist." Thus, even though Mother had a place to live and a job, the continuing coparenting struggle with Father demonstrated Mother's domestic violence circumstances were not yet changed, and instead could only be considered to be changing.

25

The court further determined that even if Mother had demonstrated sufficient changed circumstances, she had not established it would be in the children's best interest to grant her request for expanded unsupervised visitation, leading to reunification. In assessing what would promote the children's best interests, the court considered the *Kimberly F.* factors, as well as the children's need for stability and permanency and their special needs.

The court found the seriousness of the problem leading to dependency and its continuation led the court to find these factors weighed against granting Mother's section 388 petition request in the same way that it counseled against Father's. In connection with the children's bond with Mother, the court explained that while the children appeared to have a "good relationship" with her, reports demonstrated she at times has difficulty managing the children, and they are "not upset or distraught" at the end of visits with her. At the same time, however, it recognized that J. had a stronger bond with Mother than did Y. and L., which stemmed from the fact he had spent most of his life in her care. But even with respect to J., the fact the domestic violence had occurred in front of him and the other children likely "had a negative impact on" Mother's relationship with all of the children.

The court specifically noted the difficult position J. would be in if reunified with Mother, given the lengthy history of the family hiding or downplaying the domestic violence that was occurring. J. had bravely testified about his wishes to live with Mother, but he also admitted that he would likely have difficulty speaking up about any new domestic violence that might occurred in the home "because he does not want to impact placement with his Mother." This left the court rightfully worried that unsafe conditions in the home would go unreported in the future.

The court determined that the bonding study and testimony provided by Dr. Stanton was of limited value. It noted that Stanton had only minimally observed Mother with the children, and her characterization of the visits was contradicted by the social worker's reports. The court expressed particular concern that Stanton had reviewed only a small number of the Agency's reports in this case. Because of this, she "does not have a full picture of the relationship and how the ongoing protective issue may have impacted" the children's relationships with Mother. Similarly, Stanton stated that knowing the children's diagnoses and special needs would not have impacted her evaluations in the bonding study. In the court's view, however, the fact that Stanton had never been made aware of the children's diagnoses prior to her observations rendered her opinions of limited value.

The court determined that all three children had a good relationship with their respective caregivers. In particular, Y. and L. sought out their caregivers for support. The court believed the children's best interests would be served if they continued to receive the services they've been offered, particularly in connection with their special needs and behavioral challenges. To this point, witnesses had testified that Mother had not attended all of these services and was not completely aware of what they were. Indeed, the Agency and the court were uncertain whether Mother could ensure that the children continued to receive these services. In addition, Mother's "struggles" to handle the children's needs during visits, as well as her failure to respond timely to requests for information relating to the children's education or services, caused the court to question whether she could attend to all of the children's needs if they were returned to her "full-time."

The psychological evaluation Mother completed a year and a half earlier had indicated concerns for the children in her care. Although Mother disagreed with those conclusions, she was unwilling to submit to another evaluation. The court observed that while the evaluation could be argued to be "stale," Mother had not produced information about her treatment goals or her progress in treatment to demonstrate to the court that the issues identified in the evaluation were being or had been addressed. And other evidence in the record tended to show that those concerns remained. For example, the fact that Mother recently introduced the children to her new romantic partner, and her lack of awareness as to how and why the timing of this introduction was problematic, demonstrated that the concerns highlighted in the psychological evaluation remained relevant.

Beyond this, the court expressed concern that if it were to return any particular child to Mother's care, that child would be subject to court orders from the juvenile or family court regarding visitation with the different fathers. This would require all of the parents, including Mother, to follow court orders. But Mother's history of disregarding court orders left the court unconvinced she would comply in the future.

The court thus determined it was not in the children's best interest to grant Mother's section 388 petition.

3. *The Record Supports the Court's Findings That the Parents Failed to Demonstrate Changed Circumstances*

The change in circumstances alleged in support of a section 388 petition must be substantial in nature. (*In re Ernesto R.* (2014) 230 Cal.App.4th 219, 223.) During the post-reunification phase of a dependency case, "[a] parent establishes a substantial change of circumstances for purposes of section 388 by showing that, during the period between termination of reunification services and the permanency planning hearing,

28

he or she has resolved the previously unresolved issues supporting juvenile court jurisdiction." (*In re J.M.* (2020) 50 Cal.App.5th 833, 846 (*J.M.*).) Evidence of changing, rather than changed, circumstances is insufficient to justify the modification of a prior order under section 388. (*In re Alayah J.* (2017) 9 Cal.App.5th 469, 482; *Ernesto R.*, at p. 223.)

Mother and Father's reunification services were terminated at the conclusion of the December 8, 2023 hearing. The evidence in the record supports the juvenile court's conclusion that while the material circumstances were changing for the better, the problems that led to juvenile court jurisdiction had not yet been resolved. In particular, there was at least one documented altercation between the parents in June 2024, and Father admitted to yelling and using foul language directed toward Mother in February 2024, both of which occurred after services had been terminated. Even Mother's own testimony revealed the parties continue to have a high-conflict relationship, making it difficult for them to coparent their nondependent youngest child. Mother testified she was refusing to let Father see that child, and she conceded that if a court order provided him unsupervised visits, she would appeal and would not comply with such an order. She thus demonstrated that a high level of conflict remained, suggesting that the conditions were ripe for the prior domestic violence patterns to reemerge. Indeed, Mother's own therapist terminated Mother's therapy out of concern that Mother was repeating the same patterns and appeared unwilling to make the necessary changes. Given all of this, the court reasonably found the parents had demonstrated only that their circumstances were changing, but not that their circumstances had in fact changed to a degree that the court could be confident the children would be safe from further domestic violence in the home.

29

4. *The Court Did Not Abuse Its Discretion in Concluding a Return to Mother or Father Was Not in the Children's Best Interest*

Mother, J., and Father contend the trial court abused its discretion in denying Mother's and Father's respective section 388 petitions. The record does not support their contentions.

Father argues the factors set out in *Kimberly F., supra*, 56 Cal.App.4th at page 532 compelled a finding in his favor with respect to L. Under *Kimberly F.*, a trial court may consider: "(1) the seriousness of the problem which led to the dependency, and the reason for any continuation of that problem; (2) the strength of relative bonds between the dependent children to both parent and caretakers; and (3) the degree to which the problem may be easily removed or ameliorated, and the degree to which it actually has been." (*Kimberly F.*, p. 532.) The trial court considered these factors and concluded that, on balance, they did not favor a return of L. to Father.[8] We see no error in the court's determination that it would be in L.'s best interest to continue in his placement and proceed on course toward adoption.

---

[8] The same court that issued *Kimberly F.* later raised questions about its continued vitality, as *Kimberly F.* may not "give full consideration to [the] shift in focus" away from the interests of parents and to the needs of children for stability and permanency mandated by the Supreme Court in *Stephanie M., supra*, 7 Cal.4th 295. (*In re J.C.* (2014) 226 Cal.App.4th 503, 527.) Thus, where a trial court has considered and applied the *Kimberly F.* factors without also considering the shift in focus identified in *Stephanie M.*, parents potentially receive a more beneficial analysis than that to which they may be entitled. The juvenile court here considered and applied the *Kimberly F.* factors while also keeping in focus whether the changes requested by the parents would be in the children's best interests. We will therefore review the court's assessments as to these factors, but in the context of considering whether the parents have demonstrated an abuse of discretion in how the court answered the principal question at issue here, "that is, [what is in] the best interests of the child[ren]." (*Stephanie M.*, at p. 317.)

As to the seriousness of the problem that led to the dependency, and the reason for the continuation of that problem, the record reflects that L.'s removal from his parents' care was due to a serious and ongoing safety problem arising from recurring domestic violence between his parents. These violent confrontations, which occurred while the children were in the home, included the parents throwing objects at or toward one another (and sometimes near a child), hitting one another, Father stomping on Mother's head, Father dragging Mother or trying to pull her out of a car, as well as Father striking her with a belt. J. reported that the parents fought all day. This violence cannot be considered anything but extremely serious. And despite the removal of the children and the parents taking classes and participating in domestic violence programs during the pendency of this case, the physical violence did not cease until very late in this process. And even after the parents finally began to live separately, their conflict remained evident. It was not unreasonable for the court to consider the seriousness of the domestic violence, as well as the family's history of minimization and even hiding of that domestic violence, in concluding that returning L. to Father's care would not be in his best interests.

With respect to the strength of the relative bonds between L. and Father and L. and his caregiver, the court concluded that L.'s lengthy time with the caregiver meant their relationship was stronger than L.'s bond with Father. This, too, is a reasonable conclusion. Father's inconsistent visits undermined his ability to bond with L. The caretaker was the person L. sought out for support, and he did not appear troubled when he had to separate from Father at the conclusion of their visits.

On the question of the degree to which the problem that led to L's removal might be "easily removed or ameliorated" (see *Kimberly F., supra*, 56 Cal.App.4th at p. 532), we see no error in the court's determination that this factor, too, weighed against granting Father's section 388 petition. Father asserts his "commitment to ending his tendency to engage in domestic violence showed the problem could be easily removed, if it had not already been removed," and he further contends the family's issues could be readily addressed through additional family maintenance services. But these assertions are belied by the lengthy history of Father and Mother engaging in domestic violence and repeatedly denying or minimizing the problem *while* participating in services intended to address the domestic violence. A brief period of relative calm between the parents does not demonstrate that this significant problem has been fully addressed, or could be fully addressed in the relatively brief period of time that would be required for reunification to occur. Indeed, the parents continue to argue and fight over Father's visits with their nondependent child. The record and testimony at the hearing thus demonstrated that even after more than three years of Agency involvement, Mother and Father were still unable to communicate and make coparenting decisions without significant conflict and, at times, the involvement of law enforcement.

The court reasonably concluded that L.'s interest in permanency and stability would not be advanced by the granting of Father's petition. (See *Stephanie M., supra*, 7 Cal.4th at p. 317; *In re J.C., supra*, 226 Cal.App.4th at pp. 526–527.) L. has experienced day-to-day support, caring and consistency from his caregiver—not Father— for the greater part of his life. Although L. was receiving particularized special services related to his autism diagnosis, Father remained mostly unaware of what this meant for L.'s daily life, and

he showed little interest in gaining a greater understanding. In view of the entire picture presented by this record, the court's ultimate determination that returning L. to Father would not be in L's best interests cannot be considered unreasonable or arbitrary.

Although the circumstances are not identical, we reach a similar conclusion with respect to Mother's and J.'s contention that the court abused its discretion in denying Mother's section 388 petition. The same analysis regarding each of the *Kimberly F.* factors as to Father also applies to Mother. And as to the one factor where a discernable difference might exist—i.e., the strength of the relative bonds between the children and Mother and the children and their respective caregivers—the court's assessments on this point were sound.

Mother did not care for the children between May 2022 and the date of the court's decision on her section 388 petition in January 2025—a period of over two and a half years. For the youngest dependent children, Y. and L., this meant they spent almost half or more than half of their young lives living in someone else's care. Although Mother's visitation was more consistent than Father's, the youngest children did not ask for Mother outside of these visits and they did not appear upset at the conclusion of these visits. Mother suggests that the juvenile court erred in relying on the children's lack of demonstrable distress upon separating from mother as evidence that their bond with mother was not strong, such that severing their relationship with her would not cause them detriment. She posits that "expect[ing] them to cry and show serious distress" upon separation from her "shows a demonstrable lack of basic [knowledge of] child development." But Mother did not offer an alternative approach to determining what kinds of behaviors *would* be indicative of a strong or weak bond between a child

33

and a parent. The social worker, who has experience with observing family visitations, was of the opinion that the ease of separating from Mother reflected the lack of strong bond. The trial court was entitled to credit that opinion, and to infer that the lack of outward distress shown by the children suggested they were less likely to suffer irreparable damage from the severing of a relationship with Mother.

The juvenile court also sensibly treated J. as situated differently from Y. and L. The court found J.'s relationship with Mother was relatively stronger than Y. and L's relationship with her, given his age and the amount of time he spent in mother's care before his removal. But the court also understood that J.'s bond with Mother was negatively impacted by his repeated exposure to the domestic violence and daily fights occurring in the home. Moreover, the court attempted to weigh and consider the varying desires J. expressed over the course of this case. At times, J. voiced a desire to return to living with Mother. But at other times, he said he was very happy at the caretakers' home and wanted to live there permanently. He told a social worker that he wanted to call his caretakers "my parents." And in response to a social worker explaining what a legal guardianship meant, J. expressed a desire for that plan, indicating he was happy with his caretakers and how they cared for him. Thus, the court acted reasonably in concluding that even despite the relatively stronger bond between J. and Mother, it would nevertheless be in J.'s best interest to proceed toward a permanent plan of legal guardianship, which required that it deny Mother's section 388 petition.

We believe the record supports the trial court's weighing of various factors to reach the conclusion that granting Mother's section 388 petition would not be in the children's best interests. Nevertheless, Mother and J.

34

argue that the juvenile court erred in weighing certain evidence and addressing certain recommendations by those involved in this matter. For example, Mother and J. challenge the court's treatment of Dr. Stanton's bonding study report and testimony. J. contends the court should not have given more weight to the social worker's observations than to Stanton's opinions. But our role is not to reweigh the evidence or credit certain evidence more or less than the trial court did. (See, e.g., *In re Tanis H.* (1997) 59 Cal.App.4th 1218, 1226–1227.) And the trial court provided a considered explanation as to why it found Stanton's opinions to be of limited value. Her conclusions were based on limited knowledge of the family and the children's diagnoses and special needs. She also observed only two supervised visits in preparing her report. The court acted within its discretion in concluding the limited nature of these observations entitled her opinions to less weight in its assessment of the children's best interests.

In addition, J. and Mother contend the court erred by effectively rejecting the recommendation of J.'s counsel (acting as guardian ad litem), that J. be returned to Mother's care. They suggest that because minor's counsel is under a duty to provide an independent opinion as to what is in the child's best interests, the court should accept the recommendation of J.'s counsel without question. We disagree. While an appointed guardian ad litem is required to "make recommendations to the court concerning the best interest of the child" (Cal. Rules of Court, rule 5.662(d); see *In re Josiah Z.* (2005) 36 Cal.4th 664, 679–680), there is no authority dictating the weight a juvenile court must give those recommendations. Instead, the law grants the juvenile court " 'extensive' " authority "to fashion orders concerning the welfare of a dependent child." (*In re C.M.* (2017) 15 Cal.App.5th 376, 387.) In exercising this authority, the court " 'must look to the totality of the child's

circumstances.' " (*Ibid.*)  Recommendations made by a child's guardian ad litem are but a single component of this totality.

Finally, J. and Mother assert that J.s' self-harm ideation was the result of his separation from Mother.  Although not expressly argued, the implication of this portion of the briefing seems to be that the court should have granted Mother's section 388 petition to allow J. to reunify with her because reunification would have resolved J.'s concerning self-harm ideation. We disagree the record must be interpreted in this way.  Rather, the evidence reflects that the psychological dynamics leading to J.'s psychiatric holds are likely far more complex than simply being caused by J.'s removal from his home.  There is no dispute that J. witnessed repeated and severe domestic violence and daily fighting between Mother and Father.  The severity of the violence occurring while the children lived with Mother cannot be understated and certainly cannot be excluded as a possible contributor to J.'s psychological challenges.  Moreover, Mother seemingly did not prioritize J.'s educational needs while he was in her care, given the concerning number of absences and tardies that occurred despite their proximity to J.'s school. There is also evidence showing J.'s desires were not clear-cut in that he has expressed contentedness with his current placement, at one point saying he "wanted to live there forever and still be able to have visits with" Mother.

Beyond this, the persistent high-conflict dynamic between Mother and Father would mean that a return to Mother's care could risk placing J. back into the same emotional turmoil that he experienced prior to his removal. Moreover, J. acknowledged he would have difficulty reporting any future violence because he worried about preserving his family.  The court reasonably concluded that this kind of emotional burden would be detrimental to a child who had already experienced significant instability

and uncertainty. Given the complexity of the relationships and dynamics at issue here, we reject an argument suggesting the trial court failed to give sufficient consideration to J.'s psychological well-being when it determined permanent guardianship would be the best long-term plan for him. The permanency plan the court selected maintains J.'s relationship with Mother, while prioritizing the benefits available to him as a result of the stability and support provided by his caregivers.

## B. *The Court's Section 366.26 Permanency Plan*

The Legislature has declared that California has an interest in providing stable, permanent homes for children who have been removed from parental custody and for whom reunification efforts with their parents have been unsuccessful. (§§ 366.25, subd. (a), 366.26, subd. (b).) Thus, once reunification services have been terminated, the focus of a dependency proceeding shifts from family preservation to promoting the *child's* best interests, including the child's interest in a placement that is stable, permanent, and allows the caregiver to make a full emotional commitment to the child. (See *In re Fernando M.* (2006) 138 Cal.App.4th 529, 534; *In re Marilyn H.* (1993) 5 Cal.4th 295, 306.)

"The sole purpose of the section 366.26 [permanency plan] hearing is to select and implement a permanent plan for the child after reunification efforts have failed." (*In re J.D.* (2021) 70 Cal.App.5th 833, 851–852.) At the permanency plan hearing, the court may order one of three alternatives: terminate parental rights and order adoption, appoint a legal guardian, or place children in long-term foster care. If the child is adoptable, there is a strong preference for adoption over the other two alternatives. (*In re B.D.* (2021) 66 Cal.App.5th 1218, 1224.)

37

As a result of the strong preference for adoption, "[o]nce the court determines by clear and convincing evidence that a child is likely to be adopted, the burden shifts to any party opposing adoption to show that termination of parental rights would be detrimental to the child under one of the exceptions listed in section 366.26, subdivision (c)(1)." (*In re D.O.* (2016) 247 Cal.App.4th 166, 173 (*D.O.*).)  Here, it is undisputed the Y. and L. were likely to be adopted.  Thus, our focus is whether a statutory exception to adoption and the termination of parental rights applies.  The two statutory exceptions relevant here are the beneficial parental relationship exception (§ 366.26, subd. (c)(1)(B)(i)) and the sibling relationship exception (*id.*, subd. (c)(1)(B)(v)).)

  1. *The Beneficial Relationship Exception*

The parental-benefit exception (§ 366.26, subd. (c)(1)(B)(i)) applies where "[t]he court finds a compelling reason for determining that termination would be detrimental to the child" (*id.*, subd. (c)(1)(B)), including where "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (*Id.*, subd. (c)(1)(B)(i).)  This exception "allows a child a legal basis for maintaining a relationship with the child's parent if severing that relationship would, on balance, harm the child," thereby "preserv[ing] [a] child's right to [a] relationship [with his or her parent] even when the child cannot safely live with that parent." (*In re Caden C.* (2021) 11 Cal.5th 614, 643 (*Caden C.*).)

The beneficial relationship exception requires a parent to prove three elements:  "(1) regular visitation and contact, taking into account the extent of visitation permitted; (2) a substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship; and (3) a showing that terminating the

attachment would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home." (*In re M.G.* (2022) 80 Cal.App.5th 836, 847.)

"We review the juvenile court's factual findings as to whether the parent has maintained regular visitation and contact with the child, as well as the existence of a beneficial parental relationship, for substantial evidence." (*In re B.D.* (2021) 66 Cal.App.5th 1218, 1225.) In undertaking this review, we do " 'not reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts,' " and we will not disturb the juvenile court's findings even where substantial evidence to the contrary also exists. (*Caden C.*, *supra*, 11 Cal.5th at p. 640.) However, "the ultimate decision—whether termination of parental rights would be detrimental to the child due to the child's relationship with [the] parent—is discretionary and properly reviewed for abuse of discretion." (*Ibid.*) A court abuses its discretion " ' " 'by making an arbitrary, capricious, or patently absurd determination.' " ' " (*Id.* at p. 641.)

a. *Prong One of the Beneficial Relationship Exception*

As to Mother's visitation with the children, the court found she visited Y. and L. consistently.

With respect to Father, however, the court's finding was less straightforward. The court noted the reports indicated Father's visits with L. "were inconsistent until recently when visits became more consistent." Thus, although the court initially stated it planned to find Father failed to meet his burden to demonstrate regular visitation and contact with the children, it ultimately concluded Father met his burden on this first prong.

No party challenges the trial court's findings with respect to the first prong of beneficial relationship exception.

39

b. *Prong Two of the Beneficial Relationship Exception*

Regarding the second prong of the beneficial relationship exception, the court found the question close as to whether the children had a substantial, positive emotional attachment to Mother. On balance, however, the court determined Mother met her burden to demonstrate the existence of such an attachment. We therefore do not further consider this prong in connection with Mother's challenge on appeal.

As to Father, however, the court found no substantial, positive emotional bond existed between L. and him. Father contends the record does not support this finding, arguing the Agency's reports and testimony at trial provided evidence showing that L. had a "substantial, positive emotional attachment" to him. But the question is not whether there might be some evidence from which the court could have found the existence of a substantial emotional attachment. The issue before us is whether there is sufficient evidence to support the finding the juvenile court made—i.e., that L. did *not* have a substantial, positive emotional attachment with Father. (See *Caden C., supra*, 11 Cal.5th at pp. 639–640 [court finding as to existence of a beneficial parental relationship reviewed for substantial evidence].) And for purposes of the beneficial relationship exception, the emotional attachment between a child and a parent is to be considered from the child's perspective. (*Caden C.*, 11 Cal.5th at p. 633 [second element addresses "the psychological importance of the relationship for the child"].) "[C]ourts often consider how children feel about, interact with, look to, or talk about their parents. [Citations.] Doing so properly focuses the inquiry on the child . . . ." (*Id.* at p. 632.)

The record supports the trial court's conclusion that the attachment between L. and Father was not sufficiently strong that L. would benefit from continuing the relationship.  (*Caden C., supra*, 11 Cal.5th at p. 636.)  The Agency's reports note that L. "does not have an emotionally significant relationship with his father."  Father had maintained only "sporadic visitation" with L., and the lack of consistency was an impediment to strengthening their bond.  Although L. appeared to enjoy visits with Father, the evidence demonstrated that L. did not ask for Father outside of their visits, and he did not appear distraught or distressed about separating from Father when the visits ended.  And although Father's visitation did become more consistent for a brief period just before the permanency planning hearing, this change occurred late in the process, making it difficult to overcome the lack of attachment that resulted from many cancelled visits and sporadic contact earlier in the process.  The record thus provides substantial evidence to support the juvenile court's finding that Father failed to demonstrate L. "has a substantial, positive, emotional attachment to [him]." (*Ibid.*)

c.  *Prong Three of the Beneficial Relationship Exception*

Concerning the third element of the beneficial relationship exception— whether "termination would be detrimental to the child" (§ 366.26, subd. (c)(1)(B)) because of the relationship—the court must decide whether it would be harmful to the child to sever the relationship and choose adoption, despite it benefits.  (*Caden C., supra*, 11 Cal.5th at p. 633.)  In doing so, the court "needs to determine . . . in effect, what life would be like for the child in an adoptive home without the parent in the child's life."  (*Ibid.*)  Although a child might suffer effects such as "emotional instability and preoccupation leading to acting out, difficulties in school, insomnia, anxiety, or depression," as a

41

result of the loss of relationship with a parent, the benefits of an adoptive home "may alleviate the emotional instability and preoccupation leading to such problems," and could "provid[e] a new source of stability that could make the loss of a parent not, at least on balance, detrimental." (*Ibid*.)

We conclude the juvenile court did not abuse its discretion in determining that adoption by committed caregivers outweighed any detriment Y. and L. might experience by losing their relationship with Mother, or that L. might experience by losing his relationship with Father.[9]

L. was only one year old when he was removed from his parents' care, and he was two years old when he was removed from his maternal grandmother's home and placed with the caregiver. Y. was first detained when she was three, and then removed from the maternal grandmother's home and placed with the caregiver when she was four. Because of this, Y. and L. had spent a significant portion of their young lives outside of Mother's and Father's care.

The caregiver was providing both children with excellent care and addressing each child's unique needs. This included ensuring that the children were assessed for services and then facilitating the provision of those

---

[9] Although the court found Father had not met his burden with respect to the second prong of the beneficial relationship exception, it nevertheless proceeded to complete the weighing required under the third prong as to him, ultimately concluding that termination of Father's parental rights to L. would not be detrimental to L. when balanced against the benefits to him of adoption. Because the juvenile court addressed this prong with respect to Father, we will similarly assume for purposes of argument that Father showed L. had a positive emotional attachment to him and also consider whether the court abused its discretion in connection with the third prong.

services.[10]  Furthermore, the caregiver was committed to adopting both children.  She considered them to be part of her family, the children viewed her as a parental figure, and she and the children had a reciprocal affection and love for each other.  The children were physically affectionate with the caregiver, and referred to her as "Mama Maria."  They also were observed verbally expressing love for the caregiver.  Although J. contends there was "not much evidence as to attachment" with the caregiver, this evidence demonstrates significant emotional attachment.

Neither parent offered any evidence suggesting that the children were not attached to the caregiver.  In fact, Father testified the caregiver had been "taking really good care of [L.]," and he had "no complaints about how she takes care of him."  And Mother seemed to acknowledge the children's attachment to the caregiver by testifying that she was open to allowing the children to maintain a relationship with the caregiver even if the children were returned to Mother's care because she anticipated such a transition being difficult on the children.

Mother and J. both highlight the bonding study assessment provided by Dr. Stanton.  They emphasize Stanton's conclusion that Y. and L. were securely attached to Mother and that they would necessarily suffer so much detriment from the severing of her parental rights that it would outweigh the benefits to them of adoption.  But Stanton's testimony undermines this contention.  She acknowledged it would be "possible" for a child with a secure

---

[10]    This stood in stark contrast to Father, specifically, who failed to demonstrate to L's caregiver and the Agency that he understood or appreciated L.'s needs related to his autism diagnosis.  Father at one point seemed to believe that L. suffered from Down syndrome, and after being corrected, he did not ask questions of the social worker or caregiver to learn more about autism.  Father's testimony revealed that even by the time of trial, he lacked familiarity with L.'s autism-related needs.

parental attachment to "experience no detriment" from the severing of the "parent-child bond." She also conceded that she was unfamiliar with the relationship that Y. and L. have with their caregiver, as it was "not pertinent" to the bonding study she conducted. Given the limitations of the bonding study in connection with the assessments the juvenile court was tasked with making, the court acted reasonably in giving report less weight.

Given these children's young ages, their need for permanency and stability was paramount. And the caregiver was willing and able to provide permanency. Although both Mother and, with respect to L., Father, were able to maintain some parental relationship through their visitation with Y. and L., we cannot say this presents an extraordinary case where preservation of parental rights outweighs the preference for adoption. (See *In re G.B.* (2014) 227 Cal.App.4th 1147, 1166 [" ' "it is only in an extraordinary case that preservation of the parent's rights will prevail over the Legislature's preference for adoptive placement" ' "].)

We express no doubt that Mother and Father love the children, or that the parents' visits with their children were generally positive and enjoyable for everyone. However, "[a] ' "showing [that] the child would derive some benefit from continuing a relationship maintained during periods of visitation" ' is not a sufficient ground to depart from the statutory preference for adoption." (*In re Andrew M.* (2024) 102 Cal.App.5th 803, 818, quoting *In re G.H.* (2022) 84 Cal.App.5th 15, 25.)

In sum, the court reasonably concluded that maintaining Y. and L.'s relationship with Mother, and L.'s relationship with Father, did not outweigh " 'the security and the sense of belonging a new family would confer.' " (*Caden C., supra,* 11 Cal.5th at p. 633.) We therefore cannot find that the

44

juvenile court abused its discretion in declining to apply the beneficial parent-child relationship exception in connection with Y. and L.

### i. *The sibling relationship exception*

To establish the sibling relationship exception applies, the party opposing the termination of rights must demonstrate that such a result would constitute a "substantial interference with a child's sibling relationship." (§ 366.26, subd. (c)(1)(B)(v).)  In assessing whether a "substantial interference" can be demonstrated, the court is to "tak[e] into consideration the nature and extent of the [sibling] relationship, including, but not limited to, whether the child was raised with a sibling in the same home, whether the child shared significant common experiences or has existing close and strong bonds with a sibling, and whether ongoing contact is in the child's best interest, including the child's long-term emotional interest, as compared to the benefit of legal permanence through adoption." (*Ibid.*; see  *D.O.*, *supra*, 247 Cal.App.4th at p. 173.)

This statutory framework has been held to require the juvenile court to " 'first . . . determine whether terminating parental rights would substantially interfere with the sibling relationship.' " (*D.O., supra*, 247 Cal.App.4th at p. 173.)  " '*If* the court determines terminating parental rights would substantially interfere with the sibling relationship, the court is then directed to weigh the child's best interest in continuing that sibling relationship against the benefit the child would receive by the permanency of adoption.' " (*Id.* at pp. 173–174.)  The sibling bond exception is evaluated from the perspective of the child who is being considered for adoption, not the perspective of that child's siblings.  (See *In re Celine R.* (2003) 31 Cal.4th 45, 54–55.)  And in considering this exception, courts are mindful that

" ' "the child's relationship with his or her siblings would rarely be sufficiently strong to outweigh the benefits of adoption." ' " (*D.O.*, at p. 174.)

In considering Mother and J.'s appellate challenge to the court's finding that the sibling exception did not apply, we apply a hybrid standard of review. (See *In re Isaiah S.* (2016) 5 Cal.App.5th 428, 438.) We review the juvenile court's underlying factual determinations for substantial evidence, and we then consider whether the court abused its discretion in its ultimate weighing of the competing interests at stake. (*Ibid.*)

The mere existence of a sibling bond is not enough to meet the substantial interference standard. "Many siblings have a relationship with each other, but would not suffer detriment if that relationship ended. If the relationship is not sufficiently significant to cause detriment on termination, there is no substantial interference with that relationship." (*In re L.Y.L.* (2002) 101 Cal.App.4th 942, 952 (*L.Y.L.*).) Our review of the record confirms substantial evidence supports the trial court's finding that Y. and L.'s relationships with J. were not so significant, from their point of view, that the potential severing of those relationships would constitute substantial interference.

Y. and L. had been raised in the same home with J. until their removal and placement with their maternal grandmother. But they were only two and four when this occurred. L. was then removed from the grandmother's care and placed with his current caretaker in December 2022, while Y. and J. were placed in that same home three months after L.'s placement there. The children lived together with the caretakers for approximately eight months; after that point, J. was moved from that placement and into the home of his current legal guardians. Thus, Y. and L. lived in the same home with J. for

only a portion of their young lives, and thus had limited shared experiences with him.

It is true that the younger children continued to interact with J. during weekly visits, but the court reasonably presumed the limited common experiences from these weekly visits were not likely to have "impacted [them] in the same way" as those experiences impacted J. The Agency's reports support this conclusion, as they reflect that while the younger children appeared to enjoy spending time with J., Y. and L. demonstrated no particular distress upon separating from him. And there is no indication in the record that Y. or L. tended to rely on J., asked for him between visits, or appeared distraught by not having more contact with him. The record thus supports the trial court's determination that no substantial interference with Y. and L.'s sibling relationship with J. would result from the termination of parental rights because the relationship was not sufficiently developed and significant. (See *L.Y.L., supra*, 101 Cal.App.4th at p. 952.)

Further, appellants have not demonstrated an abuse of discretion in the court's ultimate determination that, on balance, the benefits to Y. and L. of adoption would outweigh any potential detriment caused by interference with the sibling relationship. These two children had been living a significant portion of their lives with a caregiver who is willing to adopt them and who has demonstrated a long-term commitment to meeting their special needs. Their caregiver has advocated for them to obtain the support they need, and they have made developmental progress and shown significant improvement while in her care. Moreover, there is evidence in the record that sibling contact between the younger children and J. would continue, even after Y. and L. are adopted. The caregivers for J., on the one hand,

and Y. and L. on the other, expressed a willingness to continue facilitating visits between the siblings.

Given that sibling contact likely will continue, and given the benefits to the children that adoption will provide, the court did not abuse its discretion in concluding that the sibling relationship exception did not apply. And even if one assumes that the sibling bond fails to thrive under these particular circumstances, it remains the case that the court acted well within reason in determining that the emotional support and consistency provided to Y. and L. by their caregiver outweighed any detriment they might suffer as a result of the severing of their sibling bond with J.

## DISPOSITION

The orders of the trial court issued on January 16, 2025 are affirmed.


DATO, Acting P. J.

WE CONCUR:


BUCHANAN, J.


CASTILLO, J.

48